UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH OF:
THE PREMISES LOCATED AT
1020 14th STREET NORTH, FARGO, ND
58102 AND PROPERTY DESCRIBED IN
ATTACHMENT A

CASE NO. 3:25-mj-106

AFFIDAVIT

UNDER SEAL

# AFFIDAVIT OF PAUL CICHOS

I, Paul D. Cichos being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am an investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Your Affiant is a Task Force Officer with the Department of Justice United States Drug Enforcement Administration and has been so since March 2019. Your Affiant is currently assigned to the Fargo Resident Office and charged with investigating drug trafficking and money laundering violations under Titles 18 and 21 of the United States Code. Your Affiant has been involved in numerous investigations dealing with the possession, manufacture, distribution, and importation of controlled substances.

2. Prior to being deputized by the DEA, I transferred to the Narcotics Unit within the Fargo Police Department, in February 2015. During my time in narcotics, I have attended courses on basic narcotics investigation. The topics include but are not limited to the investigative techniques, identification of controlled substances, and methods of their importation, transportation, manufacture, distribution, and concealment that are and have been utilized by controlled substance violators. Your Affiant is familiar with the ways in

1

which drug traffickers conduct their business, including the various means and methods by which drug traffickers distribute drugs, and the ways that drug traffickers use cellular telephones to facilitate their activity. Drug traffickers also use numerical codes and code words to conduct their transactions. In your Affiant's experience, drug traffickers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their identities and activities from law enforcement.

3. In addition to my training discussed above, during my tenure as a Task Force Officer with the DEA, I have participated in several controlled substance investigations, which have resulted in the arrest of major violators of controlled substance laws, and the seizure of illicit drugs and drug-related evidence. I have also participated in and/or executed search and seizure warrants authorizing the search of locations of drug traffickers and their co-conspirators and vehicles used to transport controlled substances. Materials searched for and recovered in these locations have included the following: controlled substances, packaging materials, scales, cutting agents, weapons, documents and papers reflecting the identity of co-conspirators, receipts for concealed investments and proceeds derived from the distribution of controlled substances and electronic equipment used by violators to communicate and coordinate criminal activity. I have conducted dozens of interviews with suspected narcotics traffickers and have gained experience with understanding the thought process and motive for these individuals to traffic narcotics into the United States.

4. I have been involved in Title III investigations in the District of North Dakota that were targeting Drug Trafficking Organizations (DTOs) distributing large amounts of methamphetamine, fentanyl, and marijuana in North Dakota. I took part in wire room monitoring, physical surveillance, arrests, controlled substance seizures, and court document writing during the investigation.

5. Your affiant is aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

6.  The facts and information contained in this Affidavit are based upon Your Affiant's personal knowledge of the investigation and observations of other officers and agents involved in the investigation. All observations referenced below that were not personally made by Your Affiant were related to Your Affiant by the persons who made such observations. This Affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by Your Affiant or known to the government.

This Affidavit is submitted in support of a search warrant for the following location:

## LOCATIONS TO BE SEARCHED

1020 14th Street North, Fargo, North Dakota, 58102 and property described in attachment A

The information provided in this Affidavit is based on my knowledge of the investigation and discussions with other law enforcement officers involved. Because this affidavit is being submitted for the limited purposes of supporting a search warrant, your affiant has not included each and every fact known concerning this investigation. It would be nearly impossible to include all known factual information in this affidavit. Instead, your affiant has provided a general overview of the investigation and has set forth only the specific facts necessary to establish probable cause to support the issuance of a search warrant for: **1020 14th Street North, Fargo, North Dakota, 58102 and property described in attachment A**

The Subject Premises is described as a single-family home. Information obtained by law enforcement indicates that Richard Carrillo lives at this residence.

The following paragraphs contain evidence to support the individuals associated with the Subject Premises in question are involved in the distribution of controlled substances. Where statements of others are set forth in this affidavit, they are set forth in substance and are not verbatim. The information contained in this affidavit is based on your affiants own personal knowledge, information gained through training and experience, in addition to information made and obtained by other law enforcement agents, witnesses and documents. Based upon your

affiant's training, experience, and participation in other Financial Investigations involving large amounts of marijuana, methamphetamine, heroin, and/or other Controlled Substances, he knows

1. That large-scale narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies.
2. That even though these assets are in the names other than the narcotics trafficker, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them.
3. That large scale narcotics traffickers must maintain, on hand, large amounts of U.S. currency in order to maintain and finance their on-going narcotics business.
4. That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.
5. That it is common for large scale drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities.
6. Those, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers.
7. That it is common for persons involved in large scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records or real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other location that they maintain dominion and control over.

8   That large scale narcotics traffickers often utilize electronic equipment such as computers, tablets, cellular phones, and currency counting machines to generate, transfer, count, record and/or store the information described in items above.

9   That when drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, and the purchase of large items such as vehicles, motor-homes, watercrafts, and tools, as a way to conceal the detection of a large-scale drug trafficker.

10  That the sale of Controlled Substances generates large quantities of U.S. Currency in small denominations. (referred to as "street money")

11  That is common for drug dealers to physically handle and count "street money" after receiving it in exchange for the Controlled Substances, thereby leaving residue traces of Controlled Substances on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of Controlled Substances and residue of Controlled Substances, and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers.

12  That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and files with IRS by all financial institutions on every currency transaction which exceeds $10,000.00, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution.

13  That in order to evade filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000.00 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency.

14  That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government. The "source" of

their income reported on these returns is usually falsely stated, misleading, or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences.

15  That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization.

16  That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs in their possession.

17  That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking of controlled substances.

18  That drug traffickers commonly have in their possession that is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons.

19  Based on Your Affiants experience, it's common for individuals involved in drug trafficking to commonly conceal their supply of drugs on their person including in their body cavities.

20  Based on Your Affiants experience dealing with out of state drug traffickers, it's also common for drug traffickers to rent cars from rental companies in another person's name. And they use the rental cars to transport drugs and money. Rental vehicles are also used because drug traffickers know that law enforcement seize vehicles used by drug traffickers and thus they use rental cars which are not owned by the trafficker to minimize their loss if they were to get arrested. By placing the rental car in someone else's name, they are attempting to avoid capture by law enforcement who may be investigating these traffickers.

21  Based on Your Affiants experience, it is common for illegal drug traffickers to have frequent and a high volume of traffic/people arriving and leaving from the residence in which they sell illegal drugs. People often drive or walk to the residence to obtain their illegal drugs.

22  Based on Your Affiants training and experience, it is known that drug traffickers often maintain books, records, notes, ledgers, receipts, and/or other documents relating to the

transportation, ordering, possession, sale, and distribution of controlled substances. The aforementioned documents are usually maintained at the suspect's residence or within their vehicles. These records often disclose the locations of other narcotics operations and operators.

23  Based on Your Affiants training and experience, it is known that it is common for individuals involved in the distribution of controlled substances to hide contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences and automobiles for ready access and to conceal them from law enforcement authorities.

24  Based on Your Affiants training and experience, it is known that individuals involved in the distribution of controlled substances usually keep paraphernalia for packaging, diluting, weighing, and distributing their drugs. This paraphernalia includes but is not limited to scales, plastic bags, and diluting agents.

25  Based on your Affiants training and experience, it is known that individuals involved in the distribution of controlled substances often utilize cell phones and/or other electronic devices to maintain contact with their customers and suppliers and to maintain records of their criminal enterprise.

26  That drug traffickers often will not possess a legitimate yearly statement of Wages or Earnings such as an Internal Revenue Service Form W-2 or other type of statement that accurately accounts for all income earned or received during a calendar year.

**PROBABLE CAUSE**

27.  In May 2024, Cass County Drug Task Force Officer Kyle Seehusen received information that Kristin Neumann and Anthony Frazier were utilizing the social media platform "Telegram" to traffic cocaine, marijuana, other illegal drugs, and firearms. TFO Seehusen also received a Snapchat username for Neumann of "k_babyyyyy612". An Under-Cover Officer (UC) added Neumann as a "friend" on an undercover Snapchat account; Neumann accepted the "friend request' and the UC was able to see some of Neumann's activity.

28. In late May of 2024, The UC observed a post made by Neumann on Snapchat that said: "Just a reminder. Telegram only, Cash only, Thank you". The UC requested Neumann's Telegram username and Neumann provided the Telegram username: "K Jean/ t.me"; The UC began following Neumann's Telegram account. Neumann provided the UC with a menu of various illegal drugs that Neumann was selling. Through the use of Telegram, the Cass County Drug Task Force conducted three separate Under Cover" (UC) controlled purchases of cocaine from Neumann.

29. In early June of 2024, the "UC" communicated with Neumann and arranged to purchase an "8 ball" (1/8 of an ounce or 3.5 grams) of cocaine for $250 cash. The controlled purchase was arranged to take place the day after the initial communication in early June, in north Fargo. Surveillance units watched Neumann arrive at the predetermined location. Shortly after, the "UC" arrived and got into Neumann's 2019 Jeep Grand Cherokee, with North Dakota license plate: 126ECL. Your Declarant notes 126ECL is registered to Kristin Neumann through the North Dakota Division of Motor Vehicles. Neumann was alone in the vehicle. The "UC" provided $250 of pre-recorded buy fund money to Neumann and received approximately 4.6 grams of cocaine. During the conversation, the "UC" asked Neumann what the cost of one ounce of cocaine would be. Neumann said "pure" cocaine would cost $1,100, but a "cut" ounce would cost $900. Neumann told the "UC" that they travel to California, sometimes near the Mexico border, because of the connections they have there. Neumann told the "UC" that "we do travel a lot", suggesting there is another person involved with Neumann's drug distribution. Neumann also talked about owning a cleaning company. After completing the drug deal, the "UC" conducted a presumptive field test, which showed to be cocaine. The cocaine was then logged into evidence at the Cass County Drug Task Force.

30. Several days later, the same "UC" communicated through the Telegram app with Neumann again to arrange for the purchase of cocaine. Neumann agreed, this time for the purchase of one ounce (approximately 28 grams) of cocaine for $1,100 cash. The controlled purchase took place at the previous location in north Fargo. Surveillance units watched Neumann's white Jeep Grand Cherokee leave her house at 3717 50th Street

South and drive to the previously agreed upon location. After both the "UC" and Neumann arrived at the location, Neumann exited her Jeep and got into the "UC" vehicle to conduct the sale. After the exchange, Neumann got back into the driver's side of the Jeep and drove away. The "UC" noted that on this occasion, Anthony Frazier was present with Neumann in the Jeep. After completing the controlled purchase, surveillance was maintained on Neumann and Frazier in the Jeep. The Jeep was observed entering the parking lot for Eagle Auto at 318 40th Street North, Fargo, North Dakota. This is a business known to be owned and operated by Richard Carrillo. Carrillo is known to law enforcement to be engaged in the sale of illicit substances and has a 2013 felony arrest for the distribution of controlled substances that was dismissed in 2015. Additionally, this shop was involved in a 2023 joint DEA and ATF investigation involving Carrillo. In early 2023, Carrillo relinquished a substantial amount of marijuana to members of the DEA Fargo Resident Office that was store inside the target residence. After completing the drug deal, the "UC" conducted a presumptive field test, which showed to be cocaine. The cocaine was then logged into evidence at the Cass County Drug Task Force.

31. In late June of 2024, the same "UC" communicated through the Telegram app with Neumann again to arrange for the purchase of cocaine. Neumann agreed, this time for the purchase of one ounce (approximately 28 grams) of cocaine for $1,100 cash. The controlled purchase took place at the previous location in north Fargo. Agents established surveillance at 3717 50 Street South, Fargo, and observed Frazier drive the Dodge Durango rental from 3717 50 Street South to 2740 Westwood Street, West Fargo. Surveillance units continued watching and observed Neumann get into the Dodge Durango and drive to the previously agreed upon meet location. Your Declarant notes Neumann was alone in the Dodge Durango at this time. After both the "UC" and Neumann arrived at the location, Neumann exited the Dodge Durango and got into the "UC" vehicle to conduct the sale. After the exchange, Neumann got back into the driver's side of the Dodge Durango and was observed traveling north onto 35th street north, then east onto 12th Avenue North. Neumann travelled east on 12th Avenue North until turning south near Albrecht Avenue North. Several minutes later Neumann's vehicle was located at 1020 14th Street North, Fargo, ND. This address is known to law enforcement to

belong to a known drug dealer in the Fargo area, Richard Carrillo. Based on previously subpoenaed cell phone data obtained for Neumann's device, Neumann is known to communicate with a device known to law enforcement to belong to Carrillo. A short time later Carrillo was observed outside the residence at 1020 14th Street North near Neumann's Durango. At that time, Neumann was seen leaving Carrillo's residence, getting into her Durango, departing the residence, and eventually meeting up with Anthony Frazier at 2740 Westwood Street. Frazier was observed driving the white Jeep Grand Cherokee to the 2740 Westwood Street address. The cocaine was then logged into evidence at the Drug Enforcement Administration and sent to the lab.

32. On July 17, 2024, Kristin Neumann and Anthony Frazier were stopped in Minneapolis, MN. Their during this stop, their vehicle was searched and the following noteworthy items were located: approximately 1 kilogram of cocaine, approximately 40 pounds of marijuana, THC cartridges, marijuana wax, approximately 400 grams of counterfeit fentanyl "M30" pills, and a ghost gun (also known as a firearm lacking a serial number).

33. On July 22, 2024 members of the DEA Fargo Resident Office pulled trash at Carrillo's residence 1020 14th Street North, Fargo, North Dakota. While searching through the trash TFO Cichos located approximately 3 grams of marijuana.

34. On July 29, 2024, members of the DEA Fargo Resident Office pulled trash at Carrillo's residence 1020 14th Street North, Fargo, North Dakota. During a search of the trash no drugs, or drug paraphernalia was located.

35. On July 30, 2024, members of the DEA Fargo Resident Office learned from a reliable source of information that Neumann was still engaged in the activity of selling illicit controlled substances. On the same date, members of the Cass County Drug Task Force and the DEA Fargo Resident Office established surveillance at Neumann's residence 3717 50th Street North, Fargo, ND. Neumann was observed leaving the residence and entering a tan Ford Taurus with no license plates. Surveillance followed Neumann to the

Stamart Travel Center 3500 12th Ave N, Fargo. Surveillance would lose sight of Neumann at the Stamart Travel Center. A short time later, Surveillance witnessed the tan Ford Taurus with no plates parked Carrillo's residence 1020 14th Street North, Fargo. A short time later, Neumann would be observed exiting the residence, getting into the tan Taurus and departing the residence. Neumann's car was followed to the area of 12th Avenue in Fargo where North Dakota Highway Patrol Trooper Irvis would execute a traffic stop on the Taurus. During the traffic stop an ounce of suspected cocaine, a large amount of U.S. currency and a cell phone where seized. Additionally, the vehicle Neumann was driving was purchased from Eagle Auto.

36. On July 30, 2024, your Declarant wrote and applied for a State of North Dakota narcotics search warrant to search the residence of 1020 14th Street North, Fargo, ND. During the execution of the warrant, numerous items were seized: several items of suspected marijuana and cocaine drug paraphernalia, approximately 3 pounds of suspected marijuana, approximately one ounce of suspected cocaine, two firearms (one of which was eventually returned due to it being a black powder gun), and $1,997 in US currency (located on Carrillo's person).

37. In January 2025, your Declarant received information indicating that Carrillo was selling drugs out of his house, 1020 14th Street North, Fargo, ND. The information indicated "there are people coming and going from the house all the time".

38. On January 13, 2025, your Declarant and DEA SA Ryan Rosemore conducted a trash pull at 1020 14th Street North, Fargo, ND. While searching the trash, the following noteworthy items were located: a small marijuana roach, Walmart grocery bags with marijuana residue, and two plastic sandwich bags with white residue. There were also several items of mail addressed to Richard Carrillo, with an address of 1020 14th Street North, Fargo, ND. Your Declarant notes a presumptive field test was conducted on one of the sandwich bags and yielded a positive result for "cocaine-HCL".

39. Based on the items located during the January 13, 2025, trash pull, your Declarant wrote and applied for a United States District Court (District of North Dakota) residential firearm and narcotics search warrant for 1020 14th Street North, Fargo, ND. The warrant was signed by Magistrate Judge Senechal on January 17, 2025. Your Declarant notes the warrant not executed and was allowed to expire.

40. On February 10, 2025, your Declarant and DEA SA Ryan Rosemore conducted a trash pull at 1020 14th Street North, Fargo, ND. While searching the trash, the following noteworthy items were located:
    - One trash bag contained two large clear plastic bags with suspected marijuana residue in each bag; the following was written on the bags: "relo" and "White fir cookics" (this is presumed to be "white fire cookies" which is a known strain of marijuana). This same bag also contained a USPS Parcel Select plastic mailing bag addressed to: "Richard Carrillo, 1304 13th Ave S, Fargo, ND, 58103-3902". Your Declarant notes Carrillo owns 2Bros Clothing Company, located at 1304 13th Ave S, Fargo, ND. According to social media posts, 2Bros Clothing Company sells apparel and glass smoke ware devices
    - Another trash bag contained a "Fargo Police Tow" tag. The tag lists a tow date of 1-18, located at 1000 Barret St N, for license plate: 733EEV. Your Declarant notes North Dakota license plate 773EEV, is registered to Emily Dominguez, 1360 32nd St S, Fargo. Emily Dominguez was present during the July 2024 search warrant at 1020 14th St N, Fargo, ND, and listed 1020 14th St N, Fargo, ND, as her address at that time. This same bag also contained a "Muha Meds White Raspberry" pen.
    - Another trash bag contained a white grocery bag with "Richard" handwritten on a sticky note.
    - Another trash bag contained a "Dutch" brand cigar package, with a suspected marijuana stem inside.

41. Your Declarant conducted a criminal history check on Carrillo and notes that Carrillo has an extensive criminal history including but not limited to convictions for aggravated assault, drug distribution, fleeing from law enforcement, and firearms possession dating back to 2009.

42. Rule 41(f)(3) of the Federal Rules of Criminal Procedure, authorizes a Magistrate Judge, upon the request of the government, to delay any notice required by Rule 41 if the delay is authorized by statute. Title 18, United States Code, Section 3013a(b), authorizes the Court to delay the notice requirements if: (1) the Court finds reasonable cause to believe that providing immediate notice of the warrant may have an adverse result; (2) the Court finds reasonable necessity for the seizure; and (3) the warrant provides for the giving of notice within a reasonable period not to exceed thirty days after the date of its execution, or on a later date certain if the facts of the case justify a longer period of delay. Based upon the information provided above, there is reasonable cause to believe that providing immediate notice of the application and order may have an adverse result and that there is a reasonable necessity for the information requested.

## CONCLUSION

43. Your Affiant believes the above information gives rise to probable cause that Richard Carrillo is conspiring to purchase and re-distribute controlled substances, evidence of which will be located at 1020 14$^h$ Street North, Fargo, North Dakota.

44. Based upon my training, education, and experience in conducting narcotics investigations, your Affiant is aware that persons who traffic in controlled substances generally keep records, notes, receipts, ledgers, logs of buyers and sellers, transaction amounts, and other similar documentation of their drug trafficking activity. They also utilize cellular phones to engage in drug trafficking, including through text messaging, social media, and phone calls. Drug traffickers also frequently possess various drug paraphernalia to aid in their drug trafficking activities, such as scales to weigh out quantities of controlled substances or smoking devices and hypodermic needles and syringes to ingest controlled substances.

45. Also based on my training and experience, consultation with other law enforcement officers experienced in investigations regarding narcotics trafficking, and the forensic examination of computers, computer tablets, cellular telephones and digital media, I have learned the following:

   a. A thorough search of computers, computer tablets, cellular phones and digital media for evidence of instrumentalities of crime commonly requires a qualified expert to conduct the search in a laboratory or another controlled environment.

   b. Searching computers, computer tablets, cellular phones and digital media is a highly technical process which requires specific expertise and specialized equipment. There are so many types of digital media in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with personnel who have specific expertise in the type of computer, computer tablet, cellular phone and digital media that is being searched.

   c. Searching computers, computer tablets, cellular phones and digital media requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Since such data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential in conducting a complete and

accurate analysis of the equipment and storage devices from which the data will be extracted.

d. Therefore, in searching for evidence, fruits, and instrumentalities of criminal activity within cellular telephones or other digital or electronic media, those items will need to be transported to an appropriate law enforcement laboratory for review to determine whether the contents thereof contain evidence and instrumentalities of violations of federal law. These items and the contents thereof will be reviewed by appropriately trained personnel in order to extract and seize any data that relates to the fruits, instrumentalities, and evidence in violation of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 1956.

e. As part of this request, I am requesting authorization to seize any computers, computer tablets such as iPads, cellular phones, including any and all media storage devices, currently inside the residence listed above relating to violations of Title 21, USC §§ 841(a) and 846, and Title 18, USC § 1956, involving Kristen Neumann, Anthony Frazier and/or any unknown or yet to be identified subjects, including lists of drug customers and related identifying information; types, amounts and prices of drugs purchased, used or trafficked, or offered for purchase or sale, as well as dates, places, and amounts of specific transactions; any information related to sources of narcotic drugs, including names, addresses, phone numbers, images, or any other identifying information; photographic or video images of drugs, drug paraphernalia, money or monetary instruments, drug use or drug transactions; any information recording the travels of Richard Carrillo

       and/or any unknown or yet to be identified subjects; and any financial account and transaction information.

f. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the Subject Premises to press their finger(s) against the Touch ID and/or Face ID sensor of the locked Apple device(s) found during the search of the Subject Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID and/or Face ID.

g. Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the electronic communication device(s) found in the Subject Premises] as described above within the five attempts permitted by Touch ID, this

       will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

    h. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises to the Touch ID and/or Face ID sensor of the seized electronic communication device(s), such as an iPhone or iPad, found at the Subject Premises] for the purpose of attempting to unlock the device via Touch ID and/or Face ID in order to search the contents as authorized by this warrant.

46. Based on the above information, Your Affiant believes Richard Carrillo and others, are actively involved in the distribution of controlled substances in North Dakota, and elsewhere. Your Affiant believes that there is evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of controlled substances, and conspiracy), Title 18, United States Code, Sections 922(g) and 924(c) (firearms offenses) and/or 1956 (money laundering) inside and on the premises located at **1020 14th Street North, Fargo, North Dakota.** And there is probable cause to search these locations for the items described in Attachment B, which is incorporated into this affidavit by reference.

47.     I hereby request the issuance of a document warrant for the property more particularly described in Attachment A for evidence and instrumentalities more particularly described in Attachment B.

Paul D. Cichos
Task Force Officer, DEA

Sworn and subscribed to before me
This 12th day of February, 2025.

Alice R. Senechal
United States Magistrate Judge